UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

MORGAN STANLEY SMITH
BARNEY LLC,

      Plaintiff,

v.

PATRICK T. O'NEILL, BRADLY A.
BLAUSEY, LINDSAY O.
CORNEILLE, JANICE W. LO,
WILLIAM S. HARTSOCK, ROBIN
STACK, ANNE ELIZABETH C.
HOLUB, and CAROL HARTSOCK,

      Defendants.

_____/

Case No. _____

Hon. _____

Saretsky Hart Michaels + Gould PC
Attorneys for Plaintiff
By:   Gary M. Saretsky (P31708)
      Brian Witus (P53062)
      Colleen M. Nickel (P79220)
995 S. Eton
Birmingham, Michigan 48009
(248) 502-3300
gsaretsky@saretsky.com
bwitus@saretsky.com
cnickel@saretsky.com
_____/

## COMPLAINT FOR INJUNCTIVE RELIEF

      Morgan Stanley Smith Barney LLC ("Morgan Stanley"), by and through

its attorneys, Saretsky Hart Michaels + Gould PC, brings the following

Complaint for injunctive relief against Defendants for (i) breach of contract; (ii)

conversion of customer lists and confidential business information; (iii) breach of fiduciary duty; (iv) unfair competition; (v) violations of the Michigan Uniform Trade Secrets Act, M.C.L. 445.1901 *et. seq.*; and (vi) violations of The Defend Trade Secrets Act, 18 U.S.C. § 1836, *et. seq.*

## I. <u>PARTIES</u>

1.      Morgan Stanley, a limited liability company incorporated in the state of Delaware with its principal place of business in New York, is a securities broker-dealer and a member of the Financial Industry Regulatory Authority ("FINRA").   Morgan Stanley's sole member is Morgan Stanley Domestic Holdings, Inc., also incorporated in Delaware with its principal place of business in New York.

2.      Patrick T. O'Neill ("O'Neill") was formerly employed by Morgan Stanley as a financial advisor in its Farmington Hills, Michigan branch office. He lives in this judicial district.

3.      Bradly A. Blausey ("Blausey") was formerly employed by Morgan Stanley as a financial advisor in its Farmington Hills, Michigan branch office. He lives in this judicial district.

4.      Lindsay O. Corneille ("Corneille") was formerly employed by Morgan Stanley as a financial advisor in its Farmington Hills, Michigan branch office. She lives in this judicial district.

5.   Janice W. Lo ("Lo") was formerly employed by Morgan Stanley as a financial advisor in its Farmington Hills, Michigan branch office. She lives in this judicial district.

6.   William S. Hartsock ("W. Hartsock") was formerly employed by Morgan Stanley as a wealth management associate in its Farmington Hills, Michigan branch office. He lives in this judicial district.

7.   Robin Stack ("Stack") was formerly employed by Morgan Stanley as a client service associate in its Farmington Hills, Michigan branch office. She lives in this judicial district.

8.   Elizabeth C. Holub ("Holub") was formerly employed by Morgan Stanley as a client service associate in its Farmington Hills, Michigan branch office. She lives in this judicial district.

9.   Carol Hartsock ("C. Hartsock") was formerly employed by Morgan Stanley as a client service associate in its Farmington Hills, Michigan branch office. She lives in this judicial district.

## II. <u>JURISDICTION AND VENUE</u>

10.   Jurisdiction is premised upon diversity of citizenship, 28 U.S.C. §1332, and the amount in controversy exceeds seventy-five thousand dollars ($75,000), exclusive of interest and costs.

11.   Immediate injunctive relief is sought pursuant to Federal Rule of

Civil Procedure 65(a).

12.     Venue is proper pursuant to 28 U.S.C. §1391(a), as the Defendants reside in this judicial district and the conduct complained of occurred in this judicial district.

13.     Contemporaneously with this filing, Morgan Stanley is filing a Statement of Claim with FINRA commencing an arbitration against Defendants. Rule 13804 of the FINRA Code of Arbitration Procedure for Industry Disputes authorizes Morgan Stanley to seek injunctive relief from this Court to maintain the status quo pending final resolution of the parties' dispute in arbitration. Exhibit "1".

### III.  INTRODUCTION AND OVERVIEW

14.     Defendants are a group of financial advisors and other professionals who, while employed by Morgan Stanley in its Farmington Hills, Michigan branch office, operated as a self-described team, the Family Legacy Group ("FLG"). Collectively, the FLG serviced Morgan Stanley clients with more than $336 million in assets under management, and which had generated in the last twelve (12) months alone nearly $3 million in commissions and fees.

15.     On Friday, February 16, 2018, Defendants resigned en masse from Morgan Stanley and immediately began to work for a direct competitor of

Morgan Stanley, Raymond James Financial Services ("Raymond James"). Contrary to their Employment Agreements with Morgan Stanley, as well as annual written affirmations that they would comply with Morgan Stanley's Code of Conduct and their common law fiduciary duties, Defendants have prior to their resignations, and continue since their resignations, to convert, misappropriate and disclose confidential, proprietary information and trade secret pertaining to Morgan Stanley's clients; solicit Morgan Stanley clients; and solicit Morgan Stanley employees.   In their Employment Agreements, Defendants expressly agreed that documents and information relating to Morgan Stanley's clients constitutes confidential and trade secret information and also constitutes Morgan Stanley's property.

16.    Specifically, Defendants have, among other things, carried out boxes of property belonging to Morgan Stanley; removed physical client files pertaining to Morgan Stanley clients; and solicited Morgan Stanley clients and employees.

17.    Particularly egregious is Defendants' conduct on the evening of February 15, 2018 – less than 24 hours prior to their resignations. Defendants had only 3 weeks before requested Morgan Stanley's financial and other support in sponsoring a marketing event at a nearby restaurant for existing and prospective female clients.  Despite the certainty of their resignations the

next morning, Defendants nonetheless used the Morgan Stanley marketing event to advise clients that they were leaving Morgan Stanley the next day and to solicit them to transfer their accounts to their new employer, Raymond James Financial Services, Inc. ("Raymond James").

18.   Prior to filing this Complaint, Morgan Stanley sought Defendants' assurance that they had, in connection with their employment and separation of employment from Morgan Stanley, complied with their Employment Agreements and Morgan Stanley's Code of Conduct.  Defendants failed to do so.  Defendants' Employment Agreements explicitly state that in the event of a breach, Morgan Stanley "will suffer immediate and irreparable harm and that money damages will not be adequate to compensate Morgan Stanley or to protect and preserve the status quo", and that "YOU CONSENT TO THE ISSUANCE OF A TEMPORARY RESTRAINING ORDER OR A PRELIMINARY OR PERMANENT INJUNCTION …".   Under the circumstances, Morgan Stanley submits it is entitled to injunctive relief.

## IV.  **THE FACTS**

### Facts Specific to Patrick T. O'Neill

19.   In 2008, in connection with his employment with Morgan Stanley's predecessor, Morgan Stanley & Co. Incorporated ("MS&Co."), O'Neill signed a "Financial Advisor Employment Agreement" wherein, inter alia, he agreed to

6

maintain the confidentiality of Morgan Stanley's confidential customer information and refrain from the solicitation of Morgan Stanley clients. Exhibit "2".

20.     On or about June 1, 2009, the Global Wealth Management Group of MS&Co. and the Smith Barney Division of Citigroup Global Markets Inc. ("Citigroup") combined and began to operate as a consolidated joint venture, Morgan Stanley Smith Barney Holdings LLC.  The joint venture owns Morgan Stanley Smith Barney LLC. During the period at issue, O'Neill was employed by MS&Co. and subsequently Morgan Stanley. O'Neill's employment, registration with FINRA and all associated assets or liabilities were contributed to the joint venture.

21.     In his Agreement, O'Neill acknowledged and agreed that certain information accessed during his employment at Morgan Stanley was considered Trade Secrets, including, but not limited to the following: (1) customer files, lists, and holding pages; (2) the names, addresses, telephone numbers, and assets and obligations carried in the accounts of Morgan Stanley's customers; and (3) Morgan Stanley customer account histories and customer risk profiles (collectively referred to herein as "Trade Secrets"). *Id.* at ¶ 2.1.

22.     O'Neill further agreed that during the course of his employment

7

with Morgan Stanley or otherwise he would not (1) remove Trade Secrets or other company records from the premises, or (2) use Trade Secrets for any purpose other than conducting the business of Morgan Stanley. *Id.* at ¶2.3. O'Neill agreed that he would cease using the Trade Secrets and return them to Morgan Stanley immediately upon termination of his employment with Morgan Stanley. *Id.* at ¶2.3

23.    O'Neill agreed that he would not disclose to any person or entity the contents of Trade Secrets during and subsequent to his employment with Morgan Stanley. *Id.* at ¶2.4.

24.    O'Neill similarly promised not to solicit clients for one year following the termination of his employment for any reason.  *Id.* at ¶3.2.

25.    O'Neill also consented to the entry of preliminary injunctive relief in the event he breached his confidentiality or non-solicitation covenants.  *Id.* at ¶ 4.1.

26.    O'Neill specifically acknowledged that if he violated any of the foregoing provisions, Morgan Stanley "will suffer immediate and irreparable harm and that money damages will not be adequate to compensate Morgan Stanley or to protect and preserve the status quo", and that "YOU CONSENT TO THE ISSUANCE OF A TEMPORARY RESTRAINING ORDER OR A PRELIMINARY OR PERMANENT INJUNCTION" to enforce the non-

solicitation and confidentiality obligations as set forth in the Agreement. *Id.*

27.    The restrictive covenants of the Financial Advisor Employment Agreement survive the termination of O'Neill's registration with Morgan Stanley.

### Facts Specific to Bradly Blausey

28.    In 2008, in connection with his employment with Morgan Stanley's predecessor, MS&Co., Blausey signed a "Financial Advisor Employment Agreement" wherein, <u>inter alia</u>, he agreed to maintain the confidentiality of Morgan Stanley's confidential customer information and refrain from the solicitation of Morgan Stanley clients. Exhibit "3".

29.    On or about June 1, 2009, the Global Wealth Management Group of MS&Co. and the Smith Barney Division of Citigroup combined and began to operate as a consolidated joint venture, Morgan Stanley Smith Barney Holdings LLC. The joint venture owns Morgan Stanley Smith Barney LLC. During the period at issue, Blausey was employed by MS&Co. and subsequently Morgan Stanley. Blausey's employment, registration with FINRA and all associated assets or liabilities were contributed to the joint venture.

30.    In his agreement, Blausey acknowledged and agreed that certain information accessed during his employment at Morgan Stanley was considered Trade Secrets, including, but not limited to the following: (1)

customer files, lists, and holding pages; (2) the names, addresses, telephone numbers, and assets and obligations carried in the accounts of Morgan Stanley's customers; and (3) Morgan Stanley customer account histories and customer risk profiles (collectively referred to herein as "Trade Secrets"). *Id.* at ¶ 2.1.

31.     Blausey further agreed that during the course of his employment with Morgan Stanley or otherwise he would not (1) remove Trade Secrets or other company records from the premises, or (2) use Trade Secrets for any purpose other than conducting the business of Morgan Stanley. *Id.* at ¶2.3. Blausey agreed that he would cease using the Trade Secrets and return them to Morgan Stanley immediately upon termination of his employment with Morgan Stanley. *Id.* at ¶2.3

32.     Blausey agreed that he would not disclose to any person or entity the contents of Trade Secrets during and subsequent to his employment with Morgan Stanley. *Id.* at ¶2.4.

33.     Blausey similarly promised not to solicit clients for one year following the termination of his employment for any reason.  *Id.* at ¶3.2.

34.     Blausey also consented to the entry of preliminary injunctive relief in the event he breached his confidentiality or non-solicitation covenants. *Id.* at ¶ 4.1.

35.     Blausey specifically acknowledged that if he violated any of the foregoing provisions, Morgan Stanley "will suffer immediate and irreparable harm and that money damages will not be adequate to compensate Morgan Stanley or to protect and preserve the status quo", and that "YOU CONSENT TO THE ISSUANCE OF A TEMPORARY RESTRAINING ORDER OR A PRELIMINARY OR PERMANENT INJUNCTION" to enforce the non-solicitation and confidentiality obligations as set forth in the Agreement.  *Id.*

36.     The restrictive covenants of the Financial Advisor Employment Agreement survive the termination of Blausey's registration with Morgan Stanley.

**Facts Specific to Lindsay Corneille**

37.     In 2015, in connection with her employment with Morgan Stanley, Corneille signed a "Financial Advisor Employment Agreement" wherein, inter alia, she agreed to maintain the confidentiality of Morgan Stanley's confidential customer information and refrain from the solicitation of Morgan Stanley clients. Exhibit "4".

38.     In her agreement, Corneille acknowledged and agreed that certain information accessed during her employment at Morgan Stanley was considered Trade Secrets, including, but not limited to the following: (1) customer files, lists, and holding pages; (2) the names, addresses, telephone

numbers, and assets and obligations carried in the accounts of Morgan Stanley's customers; and (3) Morgan Stanley customer account histories and customer risk profiles (collectively referred to herein as "Trade Secrets"). *Id.* at ¶ 2.1.

39.    Corneille further agreed that during the course of her employment with Morgan Stanley or otherwise she would not (1) remove Trade Secrets or other company records from the premises, or (2) use Trade Secrets for any purpose other than conducting the business of Morgan Stanley. *Id.* at ¶2.3. Corneille agreed that she would cease using the Trade Secrets and return them to Morgan Stanley immediately upon termination of her employment with Morgan Stanley. *Id.*

40.    Corneille agreed that she would not disclose to any person or entity the contents of Trade Secrets during and subsequent to her employment with Morgan Stanley. *Id.* at ¶2.4.

41.    Corneille similarly promised not to solicit clients for one year following the termination of her employment for any reason.  *Id.* at ¶3.2.

42.    Corneille also consented to the entry of preliminary injunctive relief in the event she breached her confidentiality or non-solicitation covenants. *Id.* at ¶ 4.1.

43.    Corneille specifically acknowledged that if she violated any of the

foregoing provisions, Morgan Stanley "will suffer immediate and irreparable harm and that money damages will not be adequate to compensate Morgan Stanley or to protect and preserve the status quo", and that "YOU CONSENT TO THE ISSUANCE OF A TEMPORARY RESTRAINING ORDER OR A PRELIMINARY OR PERMANENT INJUNCTION" to enforce the non-solicitation and confidentiality obligations as set forth in the Agreement.  *Id.*

44.    The restrictive covenants of the Financial Advisor Employment Agreement survive the termination of Corneille's registration with Morgan Stanley.

### Facts Specific to Janice Lo

45.    In 2014, in connection with her employment with Morgan Stanley, Corneille signed a "Financial Advisor Employment Agreement" wherein, <u>inter alia</u>, she agreed to maintain the confidentiality of Morgan Stanley's confidential customer information and refrain from the solicitation of Morgan Stanley clients. Exhibit "5".

46.    In this agreement, Lo acknowledged and agreed that certain information accessed during her employment at Morgan Stanley was considered Trade Secrets, including, but not limited to the following: (1) customer files, lists, and holding pages; (2) the names, addresses, telephone numbers, and assets and obligations carried in the accounts of Morgan

Stanley's customers; and (3) Morgan Stanley customer account histories and customer risk profiles (collectively referred to herein as "Trade Secrets"). *Id.* at ¶ 2.1.

47.    Lo further agreed that during the course of her employment with Morgan Stanley or otherwise she would not (1) remove Trade Secrets or other company records from the premises or (2) use Trade Secrets for any purpose other than conducting the business of Morgan Stanley. *Id.* at ¶2.3. Lo agreed that she would cease using the Trade Secrets and return them to Morgan Stanley immediately upon termination of her employment with Morgan Stanley. *Id.*

48.    Lo agreed that she would not disclose to any person or entity the contents of Trade Secrets during and subsequent to her employment with Morgan Stanley. *Id.* at ¶2.4.

49.    Lo similarly promised not to solicit clients for one year following the termination of her employment for any reason.  *Id.* at ¶3.2.

50.    Lo also consented to the entry of preliminary injunctive relief in the event she breached her confidentiality or non-solicitation covenants.  *Id.* at ¶ 4.1.

51.    Lo specifically acknowledged that if she violated any of the foregoing provisions, Morgan Stanley "will suffer immediate and irreparable

harm and that money damages will not be adequate to compensate Morgan Stanley or to protect and preserve the status quo", and that "YOU CONSENT TO THE ISSUANCE OF A TEMPORARY RESTRAINING ORDER OR A PRELIMINARY OR PERMANENT INJUNCTION" to enforce the non-solicitation and confidentiality obligations as set forth in the Agreement. *Id.*

52.    The restrictive covenants of the Financial Advisor Employment Agreement survive the termination of Jo's registration with Morgan Stanley.

**Facts Relevant to William Hartsock, Robin Stack, Anne Elizabeth Holub, and Carol Hartsock**

53.    Defendants William Hartsock, Carol Hartsock, Anne Holub and Robin Stack served in capacities other than that of Financial Advisors, but were part of the FLG.

**Facts Relevant to All Defendants**

54.    In connection with their employment with Morgan Stanley, Defendants received, read and agreed to abide by Morgan Stanley's Code of Conduct.

55.    Morgan Stanley publishes a new Code of Conduct annually and provides ongoing training, but regarding Trade Secrets, the letter and spirit of the Code of Conduct has consistently remained the same – that Trade Secrets shall remain protected.

56.    Morgan Stanley requires its employees to read the updated Code

of Conduct each year, acknowledge understanding of the mandates, and agree to be bound by the Code of Conduct. Exhibit "6" ¶14.

57.   In April 2017, Defendants signed an annual attestation acknowledging that they had read and understood Morgan Stanley's Code of Conduct and agreed to abide by the terms therein. Exhibit "7".

58.   Because Holub became employed by Morgan Stanley on or about May 1, 2017, she received a copy of the 2017 Morgan Stanley Code of Conduct in connection with her onboarding to the Firm and agreed to be bound by the policies. Exhibit "7"

59.   The Code of Conduct defines "confidential information" as information "that is not generally known by the public" including "our clients." Exhibit "8" at 36.   The Code of Conduct  states: "Much of the Firm's information is confidential information. Examples include the identity of our clients." *Id.*[1]

60.   The Code of Conduct further states: "You must protect all confidential information."   *Id.* "In particular, you must…communicate confidential information only to Morgan Stanley employees and authorized agents, such as attorneys or external auditors, who have a legitimate business reason to know the information."   *Id.*

---

[1] Morgan Stanley has attached hereto only the referenced sections of the Code of Conduct.

61.     The Code of Conduct also contains a section entitled "Protecting Firm Assets" which provides, in pertinent part, that "[y]ou are responsible for safeguarding the tangible and intangible assets of the Firm" which include "client and employee information.' Exhibit "8" at 55.

62.     The Code of Conduct further states that a personal conflict of interest arises where an employee "compet[es] with Morgan Stanley for the purchase or sale of services" and/or "tak[es] advantage of business opportunities that arise because of your position at Morgan Stanley or through the use of property or information belonging to the Firm". Exhibit "8" at 13.

63.     The Code of Conduct provides that "[y]ou must avoid any investment, activity or relationship that could, or could appear to, impair your judgment or interfere with your responsibilities on behalf of Morgan Stanley and our clients." *Id.*

64.     As consideration for the covenants and obligations agreed to by Defendants in their respective employment agreements and annual Code of Conduct acknowledgments and affirmations, Morgan Stanley compensated Defendants throughout their employment with Morgan Stanley. Morgan Stanley provided Defendants with extensive support services; paid for facilities, computer equipment, market reporting services, and other business expenses; provided Defendants with abundant sales opportunities; registered

Defendants with the New York Stock Exchange, National Association of Securities Dealers/Financial Industry Regulatory Authority, the Michigan State Securities Commission and other licensing bodies; and provided Defendants with Morgan Stanley benefits, systems, and support at all times.

65.    Additionally, Morgan Stanley provided Defendants with office facilities, secretarial services, clearing services, operational systems, product inventory, sales assistants, research, the benefit of Morgan Stanley advertising, goodwill and name recognition, access and use of experts in asset management, tax, estate planning and insurance, and with promotional, marketing and sales support.

66.    Moreover, Morgan Stanley provided Defendants with customer accounts, customer referrals, reassignments of former and current Morgan Stanley accounts, customer leads and new accounts generated by Morgan Stanley's national advertising campaign, from local seminars, from mailers, from "walk-in" and "call-in" customers, and from lists purchased and acquired by Morgan Stanley, and access to and use of confidential records relating to these accounts.

67.    On February 16, 2018, Defendants resigned en masse from Morgan Stanley and immediately joined a direct competitor, Raymond James Financial Services, Inc. ("Raymond James"), in a nearby office. Attached as

Exhibit "9" are Defendants' resignation letters.

**Facts Relevant to Defendants' Improper Conduct**

68.    Morgan Stanley is engaged in the business of, *inter alia*, providing investment services to the public at large.

69.    Morgan Stanley takes substantial precautions to maintain and protect the secrecy of its clients' private information.  For example, Morgan Stanley maintains a proprietary computer network that is secured by password and user ID protections to prevent unauthorized access.  Moreover, Morgan Stanley limits access to client information to those employees who have a need to know it.  Morgan Stanley requires those employees to agree to maintain the confidentiality of proprietary client information. See, Exhibits "2" to "5" and "8".

70.    Defendants worked for Morgan Stanley in its Farmington Hills, Michigan branch office until February 16, 2018.  Exhibit "9". In their capacity, they had access to information related to thousands of Morgan Stanley brokerage and advisory accounts valued at millions of dollars as to both assets under management and commissions and fees.   During their employment, Defendants collectively had a direct connection to Morgan Stanley's clients possessing more than $336 million in assets under management, and which generated nearly $3 million in revenue to Morgan

Stanley in the last 12 months alone. Exhibit "6" ¶9.

71.    The clients Defendants serviced at Morgan Stanley resided in multiple states, including Arkansas, Arizona, California, Colorado, Connecticut, Florida, Georgia, Iowa, Illinois, Indiana, Maryland, Missouri, Nevada, New York, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, Washington, and Michigan. Exhibit "6" ¶10.

72.    Before they resigned en masse on February 16, 2018, Defendants improperly, and in violation of their respective Employment Agreements and the Morgan Stanley Code of Conduct, converted for their own use and possibly the use of their new employer, Raymond James, confidential, proprietary and trade secret business and customer account records and information and, upon information and belief, used or will use the records and information to solicit Morgan Stanley customers to terminate their business relationship with Morgan Stanley and/or transfer to or conduct  business with them at Raymond James.

73.    On February 16, 2018, Chad Kasprzak ("Kasprzak") – the branch manager of Morgan Stanley's Farmington Hills, Michigan branch office – conducted an investigation following Defendants' resignation. The investigation included reviewing the physical books and records in the branch office, interviewing branch office employees, reviewing security video

recordings of the Farmington Hills office, reviewing copier/printer usage, reviewing other electronic documents, speaking with clients, searching for client files, and observing the behavior of branch employees. Exhibit "6" ¶3.

74.    Further, Kasprzak personally saw W. Hartsock walk out of the Farmington Hills branch office carrying a large box before Defendants tendered their resignation letters later that morning. Exhibit "6" ¶19.

75.    Moreover, video surveillance footage of the Farmington Hills branch office prior to Defendants' resignation showed W. Hartsock and C. Hartsock arriving building at approximately 7:30 am.  carrying  large brief cases and/or duffle bags.  The security video shows W. Hartsock and C. Hartsock making multiple separate trips in and out of the Morgan Stanley office within a period of approximately 10 minutes, finally walking back into the building empty handed.  Their brief cases and/or duffle bags were of the size that would accommodate standard 8.5 x 11 documents. Exhibit "6" ¶20.

76.    Following receipt of the resignation letters, a thorough search of Defendants' offices, work stations, and file cabinets was initiated, including countertops, drawers, the shred bin and Defendants' garbage cans as well as their computers, computer systems and electronic records. Exhibit "6" ¶21.

77.    Physical files pertaining to at least 25 Morgan Stanley clients serviced by the Defendants merely contained a file folder jacket, but were

missing substantive documents that were otherwise present in the physical files for Defendants' smaller Morgan Stanley clients. Exhibit "6" ¶26.

78.     Defendants' largest client, with approximately $26 million in assets under management, was Lo's only client, and despite the fact that Lo devoted her near full time efforts on behalf of this one client, a physical file pertaining to that client was not found. Exhibit "6" ¶¶23-24.

79.     The physical files for smaller Morgan Stanley clients serviced by Defendants that Morgan Stanley located in Defendants' offices, work stations, and file cabinets contained client names and numbers, telephone numbers, account numbers, notes and original copies of account and/or investment-related documents the clients executed in connection with their relationship with Morgan Stanley, which otherwise constitute confidential and trade secret information belonging to Morgan Stanley. Exhibit "6" ¶25.

80.     Upon information and belief, the missing physical files include client names and numbers, telephone numbers, account numbers, notes and original copies of account and/or investment-related documents the clients executed in connection with their relationship with Morgan Stanley.

81.     Upon information and belief, Defendants also took other client names and numbers, telephone numbers, and account numbers.  Morgan Stanley's forensic analysis of Defendants' network activity also discloses that

Defendants changed client contact information in Morgan Stanley's network shortly before their departure.

82.   Morgan Stanley has performed a forensic examination of Defendants' printing activity.

83.   The "print logs" relating to Defendants' printing activity for the two weeks immediately prior to their resignations revealed suspicious and unusual printing activities, including voluminous print jobs relating to confidential and trade secret information regarding Morgan Stanley customers. Exhibit "6" ¶17.

84.   The print logs show that the Defendants printed the following categories of documents immediately prior to their resignations: (1) information regarding direct bill payments from Morgan Stanley customers' accounts; (2) images of Morgan Stanley customer account holdings, performance, and activity; (3) a 2018 Morgan Stanley PowerPoint presentation to branch offices; and (4) spreadsheets entitled "mailing", presumably containing mailing lists of Morgan Stanley clients. Exhibit "6" ¶17.

85.   It is inescapable that Defendants have converted Trade Secrets - confidential information related to Morgan Stanley and its clients - and are using that information to improperly solicit clients to conduct business with Defendants at Raymond James or elsewhere.

86.   Moreover, to add insult to injury, on February 15, 2018 (the

evening before Defendants submitted their resignation letters), O'Neill, Corneille, and Lo hosted a Morgan Stanley sponsored client event titled "Women in the Know" (the "Event"). Exhibit "10"

87.    On January 24, 2018, Corneille requested Morgan Stanley's approval to host the event a mere twenty-three (23) days before Defendants resigned from Morgan Stanley. Exhibit "11"

88.    Morgan Stanley sponsored the Event and paid all associated fees and costs for the Event. Exhibit "12".

89.    Morgan Stanley clients were required to RSVP to C. Hartsock at Morgan Stanley on or before February 9, 2018 if they were attending the Event – seven (7) days before Defendants resigned from Morgan Stanley. Exhibit "11"

90.    Upon information and belief, Defendants knew that they were leaving Morgan Stanley to join Raymond James prior to their January 24, 2018 request for approval for the event.

91.    Upon information and belief, Defendants knew that they were leaving Morgan Stanley to join Raymond James prior to the February 9, 2018 RSVP date for the event.

92.    Upon information and belief, Defendants proceeded to host the Event on February 15, 2018 knowing that they were leaving Morgan Stanley to

join Raymond James. Not coincidentally, Defendants' form resignation letters were without date, which Defendants filled in – all saying each resigned on February 16, 2018.  Exhibit "9"

93.    Upon information and belief, Defendants intended to and did use the Event as a means of informing Morgan Stanley clients of their imminent departure and affiliation with Raymond James in an attempt to solicit and/or divert Morgan Stanley's customers and business.

94.    Indeed, shortly after Defendants resigned from Morgan Stanley on February 16, 2018, Kasprzak's investigation revealed that O'Neill and other Defendants initiated conversations with Morgan Stanley clients attending the Event and told them he and Co-Defendants were leaving Morgan Stanley to go to Raymond James. Exhibit "6" ¶28.

95.    Further, in the process of contacting Defendants' Morgan Stanley clients to notify them of Defendants' departure and the reassignment of their accounts to a new financial representative, several clients confirmed that they were informed by the Defendants of their impending resignations from Morgan Stanley and impeding affiliation with Raymond James before they actually resigned from Morgan Stanley. Exhibit "6" ¶30.

96.    Lastly, Morgan Stanley has begun receiving ACAT forms, or account transfer forms, for Morgan Stanley clients serviced by Defendants.

Exhibit "6" ¶31.

97.    By virtue of their words and conduct, Defendants have wrongfully converted Morgan Stanley records, including the names, telephone numbers, account numbers and account information of Morgan Stanley clients for the purpose of conducting business with those customers at Raymond James or elsewhere.

98.    By virtue of their words and conduct, Defendants have wrongfully solicited Morgan Stanley clients to transfer their accounts from Morgan Stanley to Raymond James while employed at Morgan Stanley.

99.    By virtue of their words and conduct, Defendants have wrongfully used Morgan Stanley assets to sponsor an event for Morgan Stanley clients designed to solicit Morgan Stanley clients to transfer their accounts from Morgan Stanley to Raymond James while employed at Morgan Stanley.

100.    In other words, Defendants have prepared to engage in, have engaged in, and continue to engage in, *inter alia*, the following acts:

(a)    removing and converting for personal use Morgan Stanley's documents and/or the information contained in confidential Morgan Stanley business records, specifically including the names, telephone numbers, account numbers, account values, pricing information and other confidential financial and personal information of Morgan Stanley customers, and possibly sharing that information with their new employer, Raymond James;

(b) removing and secreting confidential Morgan Stanley information regarding its customers and client assets;

(c) transmitting verbally, in writing, or in any other manner, the clients' names, telephone numbers, and other information contained in the records of Morgan Stanley as described in sub-paragraph (a) above;

(d) soliciting Morgan Stanley 's clients to terminate or alter their relationship with Morgan Stanley and transfer their accounts to Raymond James or elsewhere, and conduct business with them at their new firm;

(e) using Morgan Stanley's assets to solicit Morgan Stanley's clients to terminate or alter their relationship with Morgan Stanley and transfer their accounts to Raymond James or elsewhere, and conduct business with them at their new firm; and

(f) other such acts contrary to the terms, conditions, and provisions of their respective Employment Agreements with Morgan Stanley.

101. Defendants' conduct represents improper act(s) to obtain and to convert to personal use and gain Morgan Stanley's (1) records, (2) property, (3) customer names, telephone numbers and confidential account information, including account numbers, account values, and pricing information, (4) marketing and promotional techniques, and (5) goodwill generated, directly or indirectly, by Morgan Stanley, for the purpose of soliciting clients of Morgan Stanley and possibly sharing that information with Raymond James in violation

of their respective Employment Agreements with Morgan Stanley and Morgan

Stanley's Code of Conduct.

102.   Morgan Stanley asserts that:

(a)   Defendants have possession, custody, or control of Morgan Stanley records, documents, confidential customer information, proprietary information, lists of Morgan Stanley customer accounts and account information for customers provided to Defendants by Morgan Stanley;

(b)   Defendants have used and/or will use this information to solicit Morgan Stanley accounts and to divert the business of Morgan Stanley customers from Morgan Stanley; and

(c)   Defendants will otherwise continue to engage in acts constituting breaches of the terms of their respective employment agreements, and other tortious conduct, including breaches of fiduciary duties, and unfair competition.

## <u>COUNT I</u>
## <u>INJUNCTIVE RELIEF</u>

103.   Morgan Stanley reasserts paragraphs 1 through 102 of the

Complaint as if fully restated herein.

104.   Defendants have agreed that money damages are inadequate and

that Morgan Stanley is entitled to injunctive relief. Exhibits "2" to "5".   In

addition, Morgan Stanley has demonstrated a likelihood of success on the

merits and that a balancing of the equities favors the issuance of an injunction

against Defendants.

105.   Unless Defendants are preliminarily and permanently enjoined from the foregoing conduct, Morgan Stanley will be irreparably harmed by:

(a)   Disclosure of customer account numbers, customer lists and other confidential information that are solely the property of Morgan Stanley and its clients;

(b)   Loss of confidentiality of client records and financial dealings, loss of confidence and trust of clients, and loss of business reputation;

(c)   Loss and incalculable damage to Morgan Stanley's goodwill;

(d)   Loss of personnel, damage to office stability, and a threat to the enforcement of reasonable contracts; and

(e)   Incalculable financial loss.

106.   Morgan Stanley has no adequate remedy at law.

## COUNT II
## BREACH OF CONTRACT

107.   Morgan Stanley reasserts paragraphs 1 through 106 of the Complaint as if fully restated herein.

108.   Defendants have violated the confidentiality and unfair competition provisions of their respective employment agreements with Morgan Stanley and Morgan Stanley's Code of Conduct.

109.   Defendants are continuing to violate their contractual obligations.

110.   As a consequence of the foregoing, Morgan Stanley has suffered

and will continue to suffer irreparable harm and incalculable financial loss.

**COUNT III**
**TORT - CONVERSION**

111.  Morgan Stanley reasserts paragraphs 1 through 110 of the Complaint as if fully restated herein.

112.  The foregoing conduct of Defendants constitute a conversion of Morgan Stanley's confidential and proprietary information and trade secrets.

113.  As a consequence of the foregoing, Morgan Stanley has suffered and will continue to suffer irreparable harm and incalculable financial loss.

**COUNT IV**
**BREACH OF FIDUCIARY DUTY**

114.  Morgan Stanley reasserts paragraphs 1 through 113 of the Complaint as if fully restated herein.

115.  Defendants have violated their duty of loyalty and/or fiduciary duties owed to Morgan Stanley by violating their confidentiality obligations and engaging in other actions contrary to the interests of Morgan Stanley.

116.  Upon information and belief, Defendants, while employed by Morgan Stanley, secretly planned to leave the employ of Morgan Stanley and schemed to deprive Morgan Stanley of its records and Trade Secrets all in a pre-planned, calculated attempt to solicit and/or divert Morgan Stanley's customers and business.

117.   Upon information and belief, Defendants, while employed by Morgan Stanley, secretly planned to leave the employ of Morgan Stanley and used Morgan Stanley's assets to host an event, which was designed to solicit and/or divert Morgan Stanley's customers and business.

118.   As a consequence of the foregoing, Morgan Stanley has suffered and will continue to suffer irreparable harm and currently incalculable financial loss.

## COUNT V
## UNFAIR COMPETITION

119.   Morgan Stanley reasserts paragraphs 1 through 118 of the Complaint as if fully restated herein.

120.   The foregoing conduct of Defendants constitute an unfair method of competition.

121.   As a consequence of the foregoing, Morgan Stanley has suffered and will continue to suffer irreparable harm and currently incalculable financial loss.

## COUNT VI
## VIOLATION OF MICHIGAN UNIFORM TRADE SECRETS ACT

122.   Morgan Stanley reasserts paragraphs 1 through 108 of the Complaint as if fully restated herein.

123.   The foregoing conduct constitutes a violation of Michigan's

Uniform Trade Secrets Act, M.C.L. 445.1901 *et. seq.*

124.   As a consequence, Morgan Stanley has suffered and will continue to suffer irreparable harm and currently incalculable financial loss.

## COUNT VII
## VIOLATION OF THE DEFEND TRADE SECRETS ACT

125.   Morgan Stanley reasserts paragraphs 1 through 111 of the Complaint as if fully restated herein.

126.   Because (1) the confidential Morgan Stanley customer information Defendants misappropriated relates to customers from throughout the United States, and (2) the Trade Secrets are related to a product or service used in, or intended for use in, interstate or foreign commerce, Defendants' misappropriation constitutes a violation of The Defend Trade Secrets Act, 18 U.S.C. § 1836, *et. seq.*   Upon information and belief, Defendants misappropriated client information for clients residing in Arkansas, Arizona, California, Colorado, Connecticut, Florida, Georgia, Iowa, Illinois, Indiana, Maryland, Missouri, Nevada, New York, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, Washington, and Michigan.

127.   Morgan Stanley is in the business of effectuating trades on various securities exchanges and in numerous markets for its clients.   Defendants, through Morgan Stanley, buy and sell products (e.g., domestic and international securities) through means which utilize interstate and foreign

commerce (e.g., the New York Stock Exchange and other exchanges.)

128.   As a consequence, Morgan Stanley has suffered and will continue to suffer irreparable harm and currently incalculable financial loss.

## RELIEF REQUESTED

Wherefore, Morgan Stanley respectfully requests entry of a temporary restraining order and/or preliminary injunctive relief pending arbitration to be held pursuant to section 13000, *et. seq.* of FINRA's Code of Arbitration Procedure. Specifically, Morgan Stanley requests that that Defendants be prohibited from engaging in activity that violates their respective Employment Agreements and Morgan Stanley's Code of Conduct to which Defendants agreed to abide:

(1)   Defendants immediately return to Morgan Stanley all originals, copies or other reproductions, or derivatives, in any form whatsoever, including but not limited to information electronically stored, of any record of Morgan Stanley, and that Morgan Stanley be permitted to review, purge or destroy any computerized record of Morgan Stanley or its clients' information that is within Defendants' possession, custody or control;

(2)   Defendants immediately delete from any electronic device, including cell phones, any Morgan Stanley client names, telephone numbers, e-mail messages or any other information pertaining to Morgan Stanley and/or any of its current customers; and

(3)   Defendants be immediately enjoined and restrained, directly and indirectly, and whether alone or in concert with others, including, but not limited to, any officer, agent, employee,

and/or representative of Defendants' new employer, Raymond James, until hearing and thereafter until further order of this Court and/or the arbitrators from doing any of the following:

(a)    using, disclosing, or transmitting for any purpose, including solicitation of said clients, the information contained in the records of Morgan Stanley, including, but not limited to, the names, addresses, telephone numbers, and financial or other information of Morgan Stanley clients.

(b)    soliciting any business from any Morgan Stanley client and/or customer and/or account.

Morgan Stanley further requests any and all other relief this Court deems

Morgan Stanley is entitled to receive.

Respectfully submitted,

Saretsky Hart Michaels + Gould PC
Attorneys for Plaintiff

By: /s/ Gary M. Saretsky
     Gary M. Saretsky (P31708)
     Brian Witus (P53062)
     Colleen M. Nickel (P79220)
     995 S. Eton
     Birmingham, Michigan 48009
     (248) 502-3300
     gsaretsky@saretsky.com
     bwitus@saretsky.com
Dated:  February 21, 2018          cnickel@saretsky.com