# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

**MORGAN STANLEY SMITH BARNEY, LLC,**

           **Plaintiff,**

**v.**

**PATRICK T. O'NEILL, BRADLY A. BLAUSEY, LINDSAY O. CORNEILLE, JANICE W. LO, WILLIAM S. HARTSOCK, ROBIN STACK, ANNE ELIZABETH C. HOLUB, AND CAROL HARTSOCK,**

           **Defendants.**

**Case No. 18-10602**
**Hon. Sean F. Cox**

## DEFENDANTS' RESPONSE BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER <u>AND PRELIMINARY INJUNCTION</u>

## TABLE OF CONTENTS

INDEX OF AUTHORITIES....................................................................... iii

STATEMENT OF QUESTION INVOLVED........................................................ vi

CONTROLLING AND MOST APPROPRIATE AUTHORITY ...........................1

I.  INTRODUCTION ...........................................................................1

II.  STATEMENT OF RELEVANT FACTS ...........................................................3

    A.    Financial Advisors O'Neill, Blausey, Lo, and W. Hartsock
           Managed Significant Client Bases Before Becoming
           Employed by Morgan Stanley....................................................3

    B.    Financial Advisors O'Neill, Blausey, and W. Hartsock Moved their
           Pre-Existing Books to Morgan Stanley through Bringing Client
           Lists and Soliciting Clients They Previously Serviced.....................6

    C.    February 15, 2018: "Women in the Know" Event - Defendants Did
           Not Tell Any Attendees About Their Departures From Morgan
           Stanley...................................................................................7

    D.    February 16, 2018: The Team Resigns from Morgan Stanley; No
           Alleged Confidential Information and/or Trade Secrets Are Taken........7

          1.  W. Hartsock and C. Hartsock: the "duffle bags" containing a
              blood sugar monitor for diabetes, snacks, soup bowl, mug and
              space heaters....................................................................9

          2.  Corneille and W. Hartsock Documents...................................9

          3.  Physical Files....................................................................10

    E.    Morgan Stanley's Communications with Defendants' Counsel...........10

    F.    February 21, 2018: Morgan Stanley Sought a TRO *Ex Parte* Despite
           Clear Knowledge that Defendants Were Represented by Counsel........12

i

G.    AdvisorHub Article About Defendants…………………………………12

H.    Clients Make Independent Decisions to Move Their Accounts
From Morgan Stanley to Continue Working with Their………………..12
Longstanding Advisors

III.    ARGUMENT………………………………………………………………..13

A.    Standard of Review for Requests for Injunctive Relief…………..……13

B.    Plaintiff Has No Likelihood of Success of the Merits…………………14

1.  Plaintiff's Breach of Contract Claim Fails…………………………14

2.  Plaintiff's Common Law Claims Fail……………………………….16

3.  Plaintiff's MUTSA Claim Fails…………………………………..…18

4.  Plaintiff's DTSA Claim Fails……………………………………..…19

C.    Plaintiff Has Not Established Irreparable Harm………………………..20

D.    The Balance of Interests Weighs Against Injunctive Relief…………..21

E.    The Public Interest Would be Harmed by an Injunction………………..22

IV.  CONCLUSION…………………………………………………………………24

## <u>INDEX OF AUTHORITIES</u>

**Cases**

*Allis-Chalmers Mfg Co. v. Continental Aviation & Engineering Corp.*,
    255 F. Supp. 645 (E.D. Mich. 1966) ............................................................ 20, 23

*Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.*,
    270 F. Supp. 2d 943 (W.D. Mich. 2003) ..........................................................17

*Certified Restoration Dry Cleaning Network v. Tenke Corp.*,
    511 F.3d 535 (6th Cir. 2007 .................................................................................13

*CMI International, Inc v. Intermet Int'l, Corp*,
    251 Mich. App. 125; 649 N.W.2d 808 (2002) .................................................1, 18

*Degussa Admixtures, Inc v. Douglas Burnett & Sika Corp*,
    471 F. Supp. 2d 848 (W.D. Mich. 2007),
    *aff'd* 277 Fed. Appx. 530 (6th. Cir. 2008)........................................................19

*Dunlap v. City of Southfield*,
    54 Mich. App. 398; 221 N.W.2d 237 (1974) .....................................................18

*Embarcadero Techs., Inc. v. Idera, Inc.*,
    2018 WL 315753 (W.D. Tex. Jan. 5, 2018)......................................................16

*Ethypharm S.A. France v. Bentley Pharmaceuticals, Inc.*,
    388 F. Supp. 2d 426 (D. Del. 2005) ..................................................................16

*First Western Capital Mgt. Co. v. Malamed*,
    874 F.3d 1136 (2017) ........................................................................................21

*ING Life Ins. and Annuity Co. v. Gitterman*,
    No. 10-4076 (DMC)(JAC), 2010 U.S. Dist. LEXIS 85040
    (D.N.J. Aug. 18, 2010)........................................................................................15

*Interactive Solutions Group, Inc. v. Autozone Parts, Inc.*,
    2012 WL 1288173 (E.D. Mich. Apr. 16, 2012).............................................1, 16

*Kelly Services, Inc v. Greene*,
    535 F. Supp. 2d 180 (D. Maine 2008)................................................................18

*Kelly Servs., Inc. v. Marzullo*,
   591 F. Supp. 2d 924 (E.D. Mich. 2008) ...........................................................20

*Kuberski v Hayes-Albion*,
   421 Mich. 170, 364 N.W.2d 609 (1984) ...........................................................23

*Leary v. Daeschner*,
   228 F.3d 729 (6th Cir. 2000) ................................................................... 13, 14

*Mattel, Inc. v. MGA Entertainment, Inc.*,
   782 F. Supp. 2d 911 (C.D. Cal. 2011)..............................................................16

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. O'Connor*,
   194 F.R.D. 618 (N.D. Ill. 2000) ................................................................ 15, 22

*Merrill, Lynch, Pierce, Fenner & Smith v Liniere*,
   572 F Supp 246 (ND Ga 1983).........................................................................22

*Mortgage Group, LLC v. Homebridge Financial Servs., Inc.*,
   No. A-14-CA-847-SS, 2016 WL 900577 (W.D. Tex. March 2, 2016) ..............16

*Nedschroef Detroit Corp. v. Bemas Enters. LLC*,
   106 F.Supp.3d 874 (E.D. Mich. 2015) .............................................................17

*New South Equipment Mats, LLC v. Keener*,
   989 F. Supp. 2d 522 (S.D. Miss. 2013) ............................................................16

*Overstreet v. Lexington-Fayette Urban Cnty. Gov't*,
   305 F.3d 566 (6th Cir. 2002) ...........................................................................13

*Raymond James & Associates, Inc v. Leonard & Co*,
   411 F. Supp. 2d 689 (E.D. Mich. 2006) ........................................................1, 17

*Sampson v. Murray*,
   415 U.S. 61, 94 S. Ct. 837 (1974) ................................................................1, 21

*Thompson v. Chrysler Corp*,
   382 F. Supp. 1317 (E.D. Mich. 1974),
   *aff'd* 569 F.2d 989 (6th. Cir. 1978) .................................................................14

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7, 22 (2008) ...................................................................................1, 13

**Statutes**

18 U.S.C. § 1836(b)(3)...............................................................................19

**Other Authorities**

Richard F. Dole, Jr., PREEMPTION OF OTHER STATE LAW BY THE UNIFORM TRADE
    SECRETS ACT, 17 SMU SCI. & TECH. L. REV. 95, 109 (2014).........................17

**Rules**

MCL § 445.761 ......................................................................................23

Mich. Comp. Laws  445.1908(1) .........................................................1, 16

MSA § 28.61 .........................................................................................23

## <u>STATEMENT OF QUESTION INVOLVED</u>

Whether this Court should grant Plaintiff's *Ex Parte* Motion for Temporary Restraining Order and Preliminary Injunction when (1) there is no evidence that Defendants improperly solicited clients, (2) there is no evidence that Defendants stole and/or wrongfully used Plaintiff's alleged confidential information and trade secrets, (3) Plaintiff waived the right to enforce these Agreements in any event when it refused to enforce them against others for years, and (4) Plaintiff sought this *ex parte* relief when it knew Defendants were represented by counsel.

Defendants answer:  No.

Plaintiff answers:  Yes.

This Court should answer:  No.

## **CONTROLLING AND MOST APPROPRIATE AUTHORITY**

Fed. R. Civ. P. 65; *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."); *Interactive Solutions Group, Inc. v. Autozone Parts, Inc.*, 2012 WL 1288173 (E.D. Mich. Apr. 16, 2012) (Cox, J.) (citing Mich. Comp. Laws 445.1908(1)) ("By its terms, the MUTSA 'displaces conflict tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret.'"); *Raymond James & Associates, Inc v. Leonard & Co*, 411 F. Supp. 2d 689 (E.D. Mich. 2006); *CMI International, Inc v. Intermet Int'l, Corp*, 251 Mich. App. 125; 649 N.W.2d 808 (2002) (declining to issue a preliminary injunction based on the inevitable disclosure doctrine where there was no duplicitous conduct); *Sampson v. Murray*, 415 U.S. 61, 90, 94 S. Ct. 837 (1974) ("[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.")

1

# I.  INTRODUCTION

This action serves as nothing more than a thinly veiled attempt by Plaintiff to wrongfully (i) smear Defendants' reputation and cause them substantial damage, (ii) stifle and subvert clients' freedom of choice in financial advisor, (iii) convert client relationships that were largely developed by Defendants years (even decades) before they joined Plaintiff, and (iv) bully and scare employees nationwide into remaining with Plaintiff.  Tellingly, Plaintiff sought this TRO *ex parte* even though it knew Defendants were represented by counsel.

Plaintiff is doing so despite the fact that Defendants have not breached any written or other obligation to Plaintiff.  Indeed, Defendants have not improperly solicited any clients.   Nor have Defendants stolen or used any confidential information or trade secrets.  The reality is that Defendants left Plaintiff in an honorable manner and Plaintiff is afraid that others will follow suit.

With these glaring legal and factual shortcomings, not surprisingly, Plaintiff has not pled, and thus certainly cannot establish a likelihood of success on the merits or irreparable harm to support preliminary injunctive relief.[1]  Specifically, Plaintiff's claims fail for the following reasons:

---

[1] There are **no specific allegations** within the Kasprzak Affidavit, Plaintiff's sole affidavit, against Defendants Stack, Corneille, Holub, and Blausey.  Further, Morgan Stanley seeks injunctive relief that is broader than the restrictions contained within the four (4) employment agreements attached to its Complaint.

1

- **<u>Defendants have not improperly solicited any clients</u>**.  Defendants *have* not and *are* not improperly soliciting clients.  Outside of its generic and speculative "upon information and belief" based narrative, Plaintiff has not provided any support that Defendants improperly solicited any clients.  To the contrary, despite having no legal burden, Defendants have each provided a sworn factual affidavit that they have not improperly solicited.  Further, Defendants have provided over 70 client attestations (redacted to protect client confidentiality) stating that such clients exercised their independent choice to transfer their assets from Morgan Stanley and that Defendants did *not* solicit them.  There is no dispute that clients are free to choose the financial advisors they want to manage their investments.

- **<u>Defendants have not stolen any alleged trade secrets.</u>**  Similarly, Plaintiff has presented no evidence of actual misappropriation of its alleged confidential information or trade secrets.  Nor has it specified exactly what information is allegedly confidential and/or rises to the level of a trade secret.  To the contrary, despite having no legal burden, Defendants have each provided a sworn factual affidavit that they have not stolen any trade secrets.  Without any proof of actual misappropriation, Plaintiff is only left with pure speculation.  However, Michigan courts have expressly refused to apply the inevitable disclosure doctrine.[2]

- **<u>Plaintiff waived its right to enforce the Agreements given its previous conduct under the Protocol.</u>**  Ironically, Plaintiff hired Defendants as a Protocol firm that enabled Defendants to take client information to Morgan Stanley and solicit clients to move their brokerage accounts to it.  Plaintiff has not enforced these Agreements for years in Protocol transitions.  After years of waiver and non-enforcement, Plaintiff abandoned the Protocol and brought these Agreements back into existence.  Plaintiff cannot, in good faith, ask this Court to disregard years of waiver and non-enforcement of the same Agreements.  The legitimate business interest (or lack thereof) has not changed.  Moreover, Plaintiff failed to attach employment agreements for each of the Defendants.

- **<u>There is no harm to Plaintiff, let alone irreparable harm</u>**.  Plaintiff only alleged that there is irreparable harm.  This bald allegation falls significantly short of meeting Plaintiff's burden of proof in showing to this Court that there actually is irreparable harm.

---

[2] Defendants Corneille and W. Hartsock acknowledged taking two benign PowerPoint presentations before their departure (nothing that contained client information) and that they are willing to give back to Morgan Stanley.

- **Harm to Defendants _and clients_ vastly outweighs alleged harm to Plaintiff.**
The entirely speculative harm to Plaintiff is vastly outweighed by the prejudice that would result to Defendants and clients. Defendants have actually been harmed by being subject to an AdvisorHub.com article lauding Morgan Stanley's false allegations raised in this action. Defendants need to provide for their families. Clients need to be able to choose their financial advisors who advise on their investments. Reputation is critical in the financial services industry. Further, the majority of the client relationships were developed well before Defendants joined Plaintiff. Thus, Defendants and the clients would be substantially harmed if the Court issued the requested relief. Plaintiff is not entitled to an injunction simply because it wants one, or simply because its employees made a choice to leave its employ. Issuing an injunction (an extraordinary remedy) would imply that Defendants did something wrong. If Plaintiff fails to satisfy its burden (and it has failed), no injunction should issue.

Plaintiff has failed to establish any of the factors required for the extraordinary and unreasonable preliminary injunctive relief it seeks. Therefore, respectfully, this Court should deny Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction.

## II. STATEMENT OF RELEVANT FACTS[3]

### A. Financial Advisors O'Neill, Blausey, Lo, and W. Hartsock Managed Significant Client Bases Before Becoming Employed by Morgan Stanley

Since 1981, O'Neill has been a licensed registered representative in the securities industry. **Ex. A**, O'Neill Aff. ¶ 3. In the 27 years before joining Morgan Stanley, O'Neill built a longstanding and loyal customer base of approximately 400-

---

[3] The relevant facts are set forth collectively in the attached eight (8) Defendants' individual affidavits attached hereto. _See_ **Ex's A-H**. Morgan Stanley improperly lumps the eight individual defendants together. They should be considered, individually. Nevertheless, Defendants highlight certain specific issues herein.

3

450 households representing approximately $150 million of client assets under management (the "Pre-Existing Book").[4]   *Id.* ¶ 4, 7.   Approximately 60-70% of O'Neill's Pre-Existing Book can be traced to the late 1980s and 1990s when he taught classes at Ford Motor Co.   *Id.* ¶ 12.

After O'Neill joined Morgan Stanley, the majority of his Pre-Existing Book transferred the assets in their UBS Financial Services, Inc. ("UBS") accounts to Morgan Stanley so they could continue with O'Neill as their trusted financial advisor.   *Id.* ¶ 10. Morgan Stanley had nothing to do with the origination of such clients or the information that O'Neill brought to it. *Id.* ¶ 11.

The majority of O'Neill's client base when he resigned from Morgan Stanley consisted of the Pre-Existing Book or referrals therefrom.   *Id.* ¶ 13.   Morgan Stanley did not assign accounts to O'Neill.   *Id.*

In 2002, Blausey began his securities industry career and became a registered representative at UBS and partners with O'Neill.   **Ex. B**, Blausey Aff. ¶ 3–4.   In or around 2008, Blausey left UBS with O'Neill and others to join Morgan Stanley.   *Id.* ¶ 5.[5]

---

[4] For ease of reference, the term "Pre-Existing Book" will be used to describe each of the defendants' respective client relationships prior to employment at Morgan Stanley.

[5] In 2008, financial advisors O'Neill and Blausey, as well as sales assistants C. Hartsock and Stack, were a team at UBS (the "Team").  Blausey Aff. ¶ 4–5.  Since 2004, C. Hartsock, W. Hartsock's wife, has worked with O'Neill as a sales assistant.

Since 1986, W. Hartsock worked in the securities industry. **Ex. C**, W. Hartsock Aff. ¶ 4. He, like O'Neill, also built and maintained a substantial Pre-Existing Book before joining Morgan Stanley. *Id*. at 4–7. Approximately 75% of W. Hartsock's reside in Farmington, Michigan area. *Id*. at 13. Between November 1973 and January 2002, W. Hartsock served four (4) terms as Farmington's Mayor and he also served on the Farmington city council. *Id*.

In or around March 2010, W. Hartsock left UBS and joined Morgan Stanley to become a member of the Team. W. Hartsock Aff. ¶ 7. Like O'Neill, the majority of W. Hartsock's client base when he resigned from Morgan Stanley consisted of his Pre-Existing Book or referrals therefrom. *Id*. ¶ 15. Morgan Stanley did not assign accounts to him. *Id*.

Since 2004, Lo has been licensed in the securities industry. **Ex. D**, Lo Aff. ¶ 3. In or around April 2014, Lo brought to Morgan Stanley certain clients that she developed at J.P. Morgan Securities to continue to work with her as their financial advisor. *Id*. ¶ 4. In February 2017, Lo joined the Team. *Id*. at 5. The majority of Lo's client base when she resigned from Morgan Stanley consisted of her Pre-Existing Book or referrals therefrom (and personal friends). *Id*. ¶ 9.

---

**Ex. E**, C. Hartsock Aff. ¶ 4. In or around October 2008, the Team left UBS and joined Morgan Stanley. Blausey Aff. ¶ 4–5. In or around April 2015, Corneille joined the Team at Morgan Stanley to work with her father, O'Neill. **Ex. F**, Corneille Aff. ¶ 4. On or around May 1, 2017, Holub was hired by O'Neill to serve as a client service associate. **Ex. G**, Holub Aff. ¶ 3.

5

**B.      Financial Advisors O'Neill, Blausey, and W. Hartsock
Moved their Pre-Existing Books to Morgan Stanley through
<u>Bringing Client Lists and Soliciting Clients They Previously Serviced</u>**

The opening words of the Protocol for Broker Recruiting (the "Protocol") are:

"The ***principal goal*** of the following protocol is to further the ***clients' interests*** of privacy and ***freedom of choice*** in connection with the movement of their Registered Representatives ("RRs") between firms" (emphasis added).  Ex. A to O'Neill Aff. Morgan Stanley was a Protocol firm at the time that each Defendant became a Morgan Stanley employee.  O'Neill Aff. ¶ 8; W. Hartsock Aff. ¶ 9.

The Protocol enables a registered representative to move from one Protocol firm to another and, provided that such registered representative follows certain steps, take a client list with certain client contact information, as well solicit the business of the clients he or she serviced while at the departing firm, regardless of restrictive covenants contained in employment agreements.  Ex. A to O'Neill Aff.

Pursuant to the Protocol, Defendant registered representatives O'Neill, Blausey, and W. Hartsock brought to Morgan Stanley Protocol lists concerning their respective Pre-Existing Books and solicited the client relationships they serviced at UBS to transfer their accounts to Morgan Stanley.  O'Neill Aff. ¶ 9.  Clients developed before Morgan Stanley, the origination of which had nothing to do with Morgan Stanley, exercised their freedom of choice of registered representative and transferred their assets to Morgan Stanley to work with Defendants.  *Id*. at 9–10.

6

On or around November 3, 2017, Morgan Stanley withdrew from the Protocol.  O'Neill Aff. ¶ 14.

## C.   February 15, 2018: "Women in the Know" Event – Defendants Did Not Tell Any Attendees About Their Departure From Morgan Stanley

On February 15, 2018, O'Neill, C. Hartsock, Lo, and Corneille attended the Women in the Know Event.  O'Neill Aff. ¶ 34; Lo Aff. ¶ 28; Corneille Aff. ¶ 27. O'Neill and C. Hartsock created the event, which was primarily for divorced and widowed women, approximately seven (7) years ago, and it convened approximately six (6) times per year.  C. Hartsock Aff. ¶ 20.  The Defendants in attendance did not inform any Morgan Stanley clients who attended the event that they were leaving Morgan Stanley.  O'Neill Aff. ¶ 39; C. Hartsock Aff. ¶ 21; Lo Aff. ¶ 29; Corneille Aff. ¶ 28; **Ex. H**, Janet Duff Aff. ¶ 6.   In fact, one Morgan Stanley client who attended the event, Janet Duff, was "shocked" when she learned O'Neill left Morgan Stanley and later asked him why he did not inform her at the event.  Duff Aff. ¶ 8. O'Neill replied that he was not permitted to do so.  *Id*.  Duff has been a client of O'Neill for over 20 years and has referred many clients to him.  *Id*. at 2–4.

## D.   February 16, 2018: The Team Resigns from Morgan Stanley; No Alleged Confidential Information and/or Trade Secrets Are Taken

On February 16, 2018, Defendants resigned from Morgan Stanley.  O'Neill Aff. ¶ 17. Before and after their resignation from Morgan Stanley, Defendants:

      a.    <u>did not</u> solicit or attempt to solicit, directly or indirectly, any of Morgan Stanley's customers who were served by them, or whose names became known to me, while in the employ of Morgan Stanley or as a result of their employment with Morgan Stanley, with respect to securities, commodities, financial futures, insurance, tax advantaged investments, mutual funds or any other line of business in which Morgan Stanley or any of its affiliates is engaged.  They <u>did not</u> initiate contact with customers for the purpose of conducting business with or transferring accounts to any other person or firm that does business in any line of business in which Morgan Stanley or any of its affiliates is engaged;

      b.    <u>did not</u> take any Morgan Stanley records, documents, or information. Before their resignations, they only utilized Morgan Stanley records for legitimate business purposes and did not take such records upon departure;[6]

      c.    <u>did not</u> use, disclose, or transmit for any purpose, information obtained from the records of Morgan Stanley other than before their resignation for legitimate business purposes;

      d.    <u>did not</u> destroy, erase, or otherwise make unavailable any records or documents (including data or information maintained on computer media) other than before their departure in the ordinary course of business; and

---

[6] As set forth within, other than the two documents Corneille and W. Hartsock took upon departure, no other documents were taken.

e.     Other than amongst themselves, Defendants <u>did not</u> discuss their impending departure from Morgan Stanley with any other Morgan Stanley employees.  O'Neill Aff. ¶ 28; W. Hartsock Aff. ¶ 28; C. Hartsock Aff. ¶ 9; Corneille Aff. ¶ 16; Lo Aff. ¶ 22; Blausey Aff. ¶ 24; **Ex. I**, Stack Aff. ¶ 15; Holub Aff ¶ 13.

### 1. W. Hartsock and C. Hartsock: the "duffle bags" containing a blood sugar monitor for diabetes, snacks, soup bowl, mug, and space heaters

On the day of departure, W. Hartsock and C. Hartsock utilized their respective daily carry briefcase and bag to take some personal effects to their car, including: a blood sugar monitor, a gifted soup bowl, a glass that was W. Hartsock's father's, some soup cans, snacks, an empty binder, and space heaters.  W. Hartsock Aff. ¶ 36–38; C. Hartsock Aff. ¶ 15–17.  Other than that, W. Hartsock and C. Hartsock did not take out any Morgan Stanley office boxes or "duffle bags."  *Id*. [7]

### 2. Corneille and W. Hartsock Documents

Upon their departures, Corneille and W. Hartsock both took different PowerPoint presentations that did not contain any client information.  W. Hartsock Aff. ¶ 33; Corneille Aff. ¶ 20–23.  W. Hartsock also printed from his personal Morgan Stanley account certain personal bill pay documents that are accessible to all Morgan Stanley customers and are still accessible to him.  W. Hartsock Aff. ¶ 32.

---

[7] Defendants should not have been forced to answer Morgan Stanley's silly and salacious allegation in the context of a federal lawsuit, particularly when counsel repeatedly asked Morgan Stanley to provide it with any questions so that it could promptly reply and clarify pre-filing.

W. Hartsock and Corneille both took copies of non-confidential PowerPoint presentations (not containing client information) upon departure. *Id*. at 33; Corneille Aff. ¶ 23. They are both willing to return such documents to Morgan Stanley. *Id*.

### 3. Physical Files

While at Morgan Stanley, Defendants did not maintain significant physical client files per Morgan Stanley's directive to maintain paperless files. See e.g., O'Neill Aff. ¶ 32. In fact, further to a November 2017 branch audit, Morgan Stanley auditors expressed that they were pleased how thin the physical files were since pertinent client data was digitalized. Holub Aff. ¶ 19.

### E. <u>Morgan Stanley's Communications with Defendants' Counsel</u>

On February 16, 2018, around 6:00 p.m., Morgan Stanley sent a letter to Defendants. See Ex. 3 to Plaintiff's Motion. The letter stated, in part: "Based upon its preliminary and ongoing investigation, Morgan Stanley reasonably believes that the members of the Family Legacy Group are in violation of the terms and conditions of their governing agreements with Morgan Stanley." *Id*. The letter did not provide any specific assertions and did not enclose the referenced governing agreements. *Id*.

<u>Less than one hour later</u>, Defendants' counsel telephoned and left voice mail messages for two (2) of Morgan Stanley's attorneys. Thereafter, counsel transmitted an email to Morgan Stanley's counsel notifying it that Defendants were represented, that he had left voicemails for two of Morgan Stanley's attorneys, and requested that

Morgan Stanley provide specific information so that counsel could "more meaningfully inquire of [the Defendants] and more substantively reply to your letter." *Id*. at Ex. 5.  Minutes later, Defendants' counsel also e-mailed his cellular telephone number to Morgan Stanley's counsel.  Ex. B to O'Neill Aff.  Morgan Stanley's counsel never returned the calls.  O'Neill Aff. ¶ 23.

Two (2) days later, on Sunday, February 18, 2018, at 4:31 p.m., Morgan Stanley finally replied to Defendants' counsel's email.  *Id*.  Again, Morgan Stanley failed to provide any specific information or evidence of wrongdoing.  *Id*.  Instead, Morgan Stanley requested that Defendants provide their personal electronic devices to Morgan Stanly for inspection and imaging.  Ex. 6 to Plaintiff's Motion.

On Presidents' Day, Monday, February 19, 2018, Defendants' counsel reiterated: "You chose not to call me thus far and your lengthy and accusatory reply email below transmitted almost 2 days later…completely fails to provide any detail regarding your clients purported investigation, the alleged missing documents, solicitation, identification, or otherwise…you have failed to provide me with copies of the subject documents that you reference and request confirmation upon." *Id*. Ex. 7.

**F.     February 21, 2018: Morgan Stanley Sought a TRO *Ex Parte* Despite Clear Knowledge that Defendants Were Represented by Counsel**

On February 21, 2018, instead of responding to Defendants' Counsel's e-mail, Morgan Stanley rushed into Court, filed the instant action, and sought an *ex parte* TRO no less, without expressly advising the Court that Defendants were represented.

**G.     AdvisorHub Article About Defendants**

That same day, AdvisorHub.com posted an article entitled: "Morgan Stanley Says Fleeing Michigan Team Leaked Plans at Client Dinner."  Ex. C to O'Neill Aff. The article specifically named Defendants and publicized the false allegations made by Morgan Stanley in this action.  O'Neill Aff. ¶ 41.

**H.     Clients Make Independent Decisions to Move Their Accounts From Morgan Stanley to Continue Working with Their Longstanding Advisors**

Many clients have independently chosen to transfer the contents of their Morgan Stanley accounts and have Defendants continue to advise on their investments.   Attached to certain of the Defendants' Affidavits are over 70 attestations, over 10 of which are clients that have maintained a relationship with O'Neill for over 30 years, signed by clients summarizing the circumstances concerning their respective decisions and choice to transfer their account holdings away from Morgan Stanley.  Exh. D to O'Neill Aff.; Exh. C to Blausey Aff.; Exh. C to Lo Aff.; W. Exh. C to Hartsock Aff.; Exh. C to Corneille Aff.   The client

attestations show that the clients were not solicited by Defendants and that they independently chose to transfer their accounts to Defendants. *Id.*

### III. ARGUMENT

**A.** **Standard of Review for Requests for Injunctive Relief**

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The burden is on Plaintiff, and it is substantial. *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000). Such relief will only be granted where "the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). "[I]n seeking a preliminary injunction, a federal plaintiff has the burden of establishing the likelihood of success on the merits," and defendant need not even "counter" plaintiff's allegations. *Certified Restoration Dry Cleaning Network v. Tenke Corp.*, 511 F.3d 535 (6th Cir. 2007.

When considering a motion for injunctive relief, the Court must balance the following factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent preliminary injunctive relief; (3) whether granting the preliminary injunctive relief would cause substantial harm to others; and (4) whether the public interest would be served by

granting the preliminary injunctive relief. *Certified Restoration*, *supra* at 540.

"The proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *Leary*, *supra* at 739. It must do more than just "create a jury issue," and must persuade the court that it has a *likelihood* of succeeding on its claims. *Id.* "This is because the preliminary injunction is an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it." *Id.*; *Thompson v. Chrysler Corp,* 382 F. Supp. 1317, 1319 (E.D. Mich. 1974), *aff'd* 569 F.2d 989 (6th. Cir. 1978) (injunctive relief is "only issued in the most compelling cases.").

## B.  Plaintiff Has No Likelihood of Success on the Merits

### 1.  Plaintiff's Breach of Contract Claim Fails

Plaintiff was a member of the Protocol for years and refused to enforce these same kind of Agreements. Ironically, Plaintiff hired Defendants as a Protocol firm that enabled Defendants to take client information to Morgan Stanley and solicit clients to move their brokerage accounts to it. O'Neill Aff. ¶ 9. Clients exercised their freedom of choice of registered representative and transferred their assets to Morgan Stanley to continue to have their investment assets handled by the Defendants. *Id.* at 9–10. After years of waiver and non-enforcement, Plaintiff abandoned the Protocol this past November and brought these Agreements back into

14

existence.  *Id*.  Plaintiff cannot, in good faith, ask this Court to disregard years of waiver and non-enforcement of the same Agreements.  The legitimate business interest (or lack thereof) has not changed.

Even assuming, *arguendo,* that the Agreements were enforceable, there is no dispute that Defendants have not breached the Agreements.  Plaintiff's Complaint is filled with "upon information and belief" allegations and the insinuation that because they are receiving ACAT forms, Defendants must have stolen and/or used Plaintiff's alleged confidential information and/or trade secrets.  That is not enough.  Moreover, as of the date of the Affidavit supplied in connection with Plaintiff's Motion, no ACAT forms had even been sent out by Defendants.  O'Neill Aff. ¶ 40.  To the contrary, Defendants have actually testified that they have NOT improperly solicited clients and NOT stolen and/or used any alleged confidential information and/or trade secrets.  O'Neill Aff. ¶ 28; W. Hartsock Aff. ¶ 28; C. Hartsock Aff. ¶ 9; Corneille Aff. ¶ 16; Lo Aff. ¶ 22; Blausey Aff. ¶ 24; Stack Aff. ¶ 15; Holub Aff ¶ 13. Defendants also have actual evidence from clients themselves saying that Defendants did not solicit them.  *Id*. While Plaintiff has the burden of establishing its claims, the only actual evidence actually bolsters Defendants' defenses.

Furthermore, courts around the country ruling in financial services cases have held that mere contact with customers is not an improper solicitation.  *See e.g. ING Life Ins. and Annuity Co. v. Gitterman*, No. 10-4076 (DMC)(JAC), 2010 U.S. Dist.

LEXIS 85040, at *10 (D.N.J. Aug. 18, 2010) ("Merely being in contact with former clients does not constitute solicitation"); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. O'Connor*, 194 F.R.D. 618, 620 (N.D. Ill. 2000) (a prohibition against advising customers of departing broker's new affiliation would be "unlawful, as well as unreasonable").  Accordingly, Plaintiff is not likely to succeed on the merits of its breach of contract claim.

### 2.    Plaintiff's Common Law Claims Fail

Plaintiff's common law claims for conversion (Count III), fiduciary duty (Count IV), and unfair competition (Count V) are preempted by MUTSA.  "By its terms, the MUTSA 'displaces conflict tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret.'"  *Interactive Solutions Group, Inc. v. Autozone Parts, Inc.*, 2012 WL 1288173 (E.D. Mich. Apr. 16, 2012) (Cox, J.) (citing Mich. Comp. Laws  445.1908(1)).  This is so whether the information allegedly taken actually rises to the level of trade secrets.  *Id.*[8]  Because

---

[8] This is not only widely recognized, but it is also the overwhelmingly majority approach throughout the nation.  *See, e.g. Embarcadero Techs., Inc. v. Idera, Inc.*, 2018 WL 315753 (W.D. Tex. Jan. 5, 2018):

"Most courts considering this question have determined UTSA was intended to preempt all claims based upon the unauthorized use of information." *360 Mortgage Group, LLC v. Homebridge Financial Servs., Inc*., No. A-14-CA-847-SS, 2016 WL 900577, at *8 (W.D. Tex. March 2, 2016); *see also New South Equipment Mats, LLC v. Keener*, 989 F. Supp. 2d 522, 534 (S.D. Miss. 2013) ("Most of the courts that have considered this issue hold that UTSA preemption extends to claims for the misappropriation of confidential or proprietary

Plaintiff's common law claims are based upon Defendants' alleged improper theft and/or use of Plaintiff's alleged confidential information and trade secrets (*see* Complaint, ¶ 112, 115, 116, and 120), they have been displaced by MUTSA.  As such, Plaintiff's common law claims are not likely to succeed.

Further, as to Plaintiff's fiduciary duty claim, Plaintiff also appears to argue that Defendants breached that duty by "secretly plan[ning]" to leave Plaintiff. Complaint, ¶ 116.  However, the law and the Agreements themselves are clear that Defendants have every right to *prepare* to leave Plaintiff.  *See Raymond James & Associates, Inc v. Leonard & Co*, 411 F. Supp. 2d 689 (E.D. Mich. 2006); *Nedschroef*

---

information that does not qualify as trade secrets."); *Mattel, Inc. v. MGA Entertainment, Inc.*, 782 F. Supp. 2d 911, 987 (C.D. Cal. 2011) ("[T]he Court concludes that UTSA supersedes claims based on the misappropriation of confidential information, whether or not that information meets the statutory definition of a trade secret."); *Ethypharm S.A. France v. Bentley Pharmaceuticals, Inc.*, 388 F. Supp. 2d 426, 433 (D. Del. 2005) ("Because all claims stemming from the same acts as the alleged misappropriation are intended to be displaced, a claim can be displaced even if the information at issue is not a trade secret. Thus, a determination of whether the information at issue constitutes a trade secret under the DUTSA need not be addressed prior to making a determination of displacement."); *Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.*, 270 F. Supp. 2d 943, 948–49 (W.D. Mich. 2003) ("[T]he Court concludes that the disputed status of information as a trade secret does not preclude a court from determining whether a claim or claims are displaced by the MUTSA."). This has been referred to by legal scholars in the field as the "majority approach."  See Richard F. Dole, Jr., PREEMPTION OF OTHER STATE LAW BY THE UNIFORM TRADE SECRETS ACT, 17 SMU SCI. & TECH. L. REV. 95, 109 (2014) ("The majority approach preempts noncontractual legal claims protecting business information, whether or not the business information is a Uniform Act trade secret.")."

*Detroit Corp. v. Bemas Enters. LLC*, 106 F.Supp.3d 874, 883 (E.D. Mich. 2015) ("an employee may take steps to establish a competing business while still employed without breaching the duty of loyalty . . . .").

### 3. Plaintiff's MUTSA Claim Fails

Plaintiff provided no evidence whatsoever of actual misappropriation of its alleged confidential information and trade secrets. As supported by Defendants' Affidavits, there is no dispute that Defendants have not stolen or wrongfully used any confidential information and/or alleged trade secrets.

Without any evidence of actual misappropriation, apparently Plaintiff believes that Defendants **may** *inevitably* use or disclose their alleged confidential information and trade secrets. However, the inevitable disclosure doctrine has not been adopted by Michigan courts and, in any event, requires some form of "duplicitous" conduct on the part of the defendant. *See CMI International, Inc v. Intermet Int'l, Corp*, 251 Mich. App. 125; 649 N.W.2d 808 (2002) (declining to issue a preliminary injunction based on the inevitable disclosure doctrine where there was no duplicitous conduct); *see also Kelly Services, Inc v. Greene,* 535 F. Supp. 2d 180, 186 (D. Maine 2008) (denying <u>all</u> injunctive relief where Kelly had not presented any evidence that its trade secrets or confidential information were being used); *Dunlap v. City of Southfield*, 54 Mich. App. 398, 403; 221 N.W.2d 237 (1974) ("It is well established

18

that an injunction will not lie upon the mere apprehension of future injury or where the threatened injury is speculative or conjecture.").

In light of this lack of evidence of misappropriation, the Court should recognize that Michigan courts have awarded attorneys' fees under MUTSA to defendants when plaintiffs have wrongfully brought and maintained MUTSA actions. *See Degussa Admixtures, Inc v. Douglas Burnett & Sika Corp,* 471 F. Supp. 2d 848 (W.D. Mich. 2007), *aff'd* 277 Fed. Appx. 530 (6th. Cir. 2008).

Because of the lack of any evidence of misappropriation or duplicitous conduct by Defendants, Plaintiff has no basis to raise a claim under MUTSA and there is no likelihood of success on their MUTSA claim or their breach of confidentiality agreement claim. If anything, there is a stronger likelihood that Defendants would be awarded attorneys' fees under *Degussa*.

### 4. Plaintiff's DTSA Claim Fails.

Like the claims brought under its state-law counterpart the Michigan Uniform Trade Secrets Act, Plaintiff's claim for violation of the Defend Trade Secrets Act of 2016 ("DTSA") also fails. Under 18 U.S.C. § 1839, in order to prove misappropriation a plaintiff must establish that the defendant acquired a trade secret by improper means, or actually disclosed or used a trade secret without consent. *Id.* at § 1839(5). Here, there has been no true allegation—and even less evidence—that

19

Defendants improperly acquired Plaintiff's trade secrets or in any way used or disclosed such trade secrets.

Notably, in addition to the fact that Michigan courts have not adopted the "inevitable disclosure" doctrine, the DTSA expressly prohibits an injunction being granted under such circumstances.  18 U.S.C. § 1836(b)(3) states that a court may grant an injunction under appropriate circumstances, but only provided that the order does not "prevent a person from entering into an employment relationship, and that conditions placed on such employment shall be based on evidence of threatened misappropriation and not merely on the information the person knows."  Without some evidence of actual or at least threatened misappropriation, Plaintiff's claim must fail.

For the same reasons as noted in analyzing the likelihood of success under Plaintiff's MUTSA claim, Plaintiff has failed to establish a likelihood of success on its DTSA claim.

## C.   <u>Plaintiff Has Not Established Irreparable Harm</u>

Plaintiff fails to establish that it will suffer irreparable harm if an injunction is not granted.  "A trade secret will not be protected by the extraordinary remedy of injunction on mere suspicion or apprehension of injury." *Allis-Chalmers Mfg Co. v. Continental Aviation & Engineering Corp.*, 255 F. Supp. 645, 654 (E.D. Mich. 1966); *see also Kelly Servs., Inc. v. Marzullo*, 591 F. Supp. 2d 924, 942 (E.D. Mich.

2008) ("It is well established that an injunction will not lie upon the mere apprehension of future injury or where the threatened injury is speculative or conjectural."). Moreover, federal appellate courts have held that the DTSA "merely authorizes and do[es] not mandate injunctive relief and thus do[es] not allow a presumption of irreparable harm." *First Western Capital Mgt. Co. v. Malamed*, 874 F.3d 1136, 1143 (2017). As that court noted in bold letters, "**No Showing of Irreparable Harm, No Preliminary Injunction**." *Id.*

Even if, *arguendo*, Plaintiff showed any harm, "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90, 94 S. Ct. 837 (1974).

## D.      The Balance of Interests Weighs Against Injunctive Relief

Plaintiff unreasonably requests that this Court issue a public injunction, which necessarily implies that Defendants did something wrong (and thereby harms their reputation), despite the fact that Defendants have not breached the Agreements and there is no evidence that Defendants wrongfully solicited clients or misappropriated any confidential information or trade secrets. Plaintiff's claims are based on rank speculation and the fictitious harm to Plaintiff is well outweighed by the harm that

would result to Defendants.   Defendants need to provide for their families and enjoining them (with no evidence of wrongdoing) would harm their reputation. Indeed, there has already been leak of false information about Defendants on Advisorhub.com, suggesting that Defendants solicited clients at a dinner event the night before their departures.  That simply did not happen. *See* **Ex**. H.

In *Merrill, Lynch, Pierce, Fenner & Smith v Liniere*, 572 F Supp 246, 249 (ND Ga 1983), the court addressed this concern:

> If an injunction were to issue, damage to [the Employee] while she waited ultimately to prevail would be catastrophic as a result of the loss of most of her income.  Because the effect of the loss of income pending the outcome of this dispute would, by reason of the differing financial strength of a large brokerage firm and an individual broker, bear far more heavily on [the Employee] than on Merrill Lynch, that disparity of effect supports denial of an injunction.

There is no reason to destroy Defendants' livelihood given Plaintiff's purely speculative allegations and the complete lack of evidence.  Conversely, if an injunction is denied, Plaintiff will suffer no irreparable harm.  There has been and is no harm to Plaintiff.  The balance of the harms weighs in favor of denying the injunction.

## E.   **The Public Interest Would be Harmed by an Injunction**

Public policy considerations also weigh against issuance of such onerous and unreasonable injunctive relief.  The public interest will not be served by causing Defendants' loss of employment, harm to their reputation, or by enforcing a

22

previously unenforced Agreement.  The public interest only favors the enforcement of restrictive covenants if they are reasonable and necessary to protect legitimate business interests.  Moreover, public policy favors that clients should have choice in their financial advisor.  Here, the public interest dictates that Plaintiff's request for injunctive relief be denied.

The Michigan Supreme Court, in *Kuberski v Hayes-Albion,* 421 Mich. 170, 364 N.W.2d 609 (1984), noted as follows:

> In *Allis Chalmers Mfg. Co. v. Continental Aviation & Engineering Corp.*, 255 F. Supp. 645, 654 (E.D. Mich. 1966), the Court emphasized the importance of striking the "proper balance between the public policy of Michigan, as declared in [MCL § 445.761; MSA § 28.61], of protecting and encouraging the right of the individual to pursue her livelihood in the vocation she chooses, including the right to migrate from one job to another, and the rights of an employer to its accumulated body of trade secrets obtained by the expenditure of great amounts of time and money."

421 Mich. at 188 (emphasis added). Although an applicable statute has changed the standard for restrictive covenant enforcement, the public policy in the balancing of interests remains the same.  Non-compete agreements may be enforced only if they protect an employer's reasonable legitimate business interests.  Issuing an injunction against Defendants does not protect a legitimate business interest of Plaintiff when (1) Plaintiff failed to enforce these same Agreements against others for years, (2) there is no evidence that Defendants

improperly solicited clients, and (3) there is no evidence that Defendants stole or used Plaintiff's alleged confidential information and trade secrets.

## IV. CONCLUSION

Plaintiff has failed to satisfy the necessary elements to justify the extraordinary relief of a preliminary injunction.  Specifically, Plaintiff cannot establish a likelihood of success on the merits of its claims, and any damages that Plaintiff allegedly will incur are specifically and expressly quantifiable.  Therefore, this Court should deny Plaintiff's request for preliminary injunctive relief.

Respectfully submitted,

BUTZEL LONG, a professional corporation

By: /s/ *Bernard J. Fuhs*

Bernard J. Fuhs (P69621)
150 W. Jefferson – Suite 100
Detroit, MI 48226
(313) 225-7000
Attorney for Defendants

Co-Counsel
David A. Gehn (*pro hac vice pending*)
Matthew B. Baum (*pro hac vice pending*)
Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas
New York, NY 10105
Dated:  February 26, 2018          (212) 370-7889

## **CERTIFICATE OF SERVICE**

I hereby certify that on **February 26, 2018**, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to all registered ECF participants listed for this case.

Respectfully submitted,

BUTZEL LONG, a professional corporation

By:/s/*Bernard J. Fuhs*
    Bernard J. Fuhs (P69621)
    150 W. Jefferson – Suite 100
    Detroit, MI 48226
    (313) 225-7000
    Attorneys for Defendants

25